The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable John W. Turner presiding. Thank you and good morning. We are here on People v. Pearce. That's case number 4-210562. Counsel for Appellate, would you please identify yourself for the record? Good morning. My name is Rachel Kinstrand. I'm an Assistant Appellate Defender with the Office of the Appellate Defender, and I represent Appellate v. Pearce. Okay, and that's Kinstrand, not Kinstrand then? Right. It's spelled like kind and strand, but it's pronounced Kinstrand. All right. I'll try to remember that. Hopefully not mispronounce it later on, but it's always possible with me. Counsel for Appellate, would you please state your name for the record? My name is Brittany Whitfield, appearing on behalf of the Appellate people of the State of Illinois. All right. Wonderful. Ms. Kinstrand, you may proceed with your argument. Good morning, and may it please the Court and Counsel, as I've already stated, I represent the Appellate v. Pearce. I will address the fitness issue first, since Pearce's mental health issues underlie many of his claims, but I will also address Argument 1 related to the improper rebuttal evidence and Argument 4 related to the lack of a representative veneering. In this case, the record is replete with evidence raising a bona fide doubt as to Mr. Pearce's fitness. First, he was taken to the hospital about 11 p.m. even before this incident occurred. He claimed he was having chest pains or a fast heart rate. Now, for some reason, he ended up back at the hotel, and when the police and the fire department arrived in response to the fire, he's recorded telling responders that he didn't want to die. At one point, he told Officer Cheney that he felt like he was losing his mind. Subsequently, he was taken to the hospital again, and eight hours later, on his way to the police station, he was recorded stating that he believed people wanted to shoot him and that he was going to be murdered. Then, at trial, when he testified, he persisted in his belief that a male officer pulled a gun on him and chambered around in the hotel room, despite video evidence to the contrary. Then, in aggravation at his sentence, the state presented evidence that in a separate incident, Pearce checked into a hotel and called for help when he believed people were shooting at him from a non-existent window. Good morning, counsel. Good morning. There is a difference between mental illness and fitness, is there not? Yes, I believe there is. I mean, I believe the statutes are set forth to allow for different standards for insanity, guilty but mentally ill, and fitness issues. Right, so that somebody can be mentally ill but fit, isn't that correct? I believe somebody can, but I also believe there's not a litmus test for determining what I believe delusions certainly can be considered in determining whether he can assist in his own defense. I think there seems to be some sort of underlying assumption that as long as he wasn't acting out in court, he was fit. And I think this case stretches the limits of what lawyers can reasonably assess in terms of somebody's fitness for trial or for the purposes of an affirmative defense without conducting a behavioral examination, which just wasn't done in this case. But in order to be fit, somebody has to be able to understand what's happening within the court proceedings and cooperate with his or her attorney, isn't that correct? That's true. And initially, he wasn't cooperative at all. And he wasn't cooperative with the probation department when they were doing his pre-sentence investigation report. That changed, did it not? And we have a clue that that changed when his attorney answered ready for trial. We have a clue that she believed he was cooperative at that point. However, cooperation and fitness are not the same thing. And again, the case law says that there's not a litmus test that all of these other factors can be considered in determining what somebody can assist in their own defense. And I'm bothered by the persistent delusions that he seems to have highlighted not only before the incident in the hotel, but even eight hours later. I don't know how you can make an evaluation on either an affirmative defense or really on his fitness without conducting a behavioral examination. And that just wasn't done in this case. And despite defense counsel acknowledging that there was significant mental health issues, the fact that the trial court saw videos of Pierce's behavior prior to trial, and most unusually that the state argued Pierce was mentally ill, no one requested a fitness examination. Based on all of the circumstances in this case, the court had an obligation to order an examination and hold a hearing on his fitness. But additionally, defense counsel should have asked for an examination, both to determine his fitness and to determine whether he was sane or guilty, but mentally ill at the time of the fire. On the latter point, without obtaining Pierce's medical records or an examination, counsel could not have made a strategic decision as to what defense to raise on his behalf. Counsel? Yes. What about those medical records? We have a hole in the record. We don't know if those medical records were ever received or not. Right. And I, you know, I, I don't think the record supports that she actually got them, but even assuming they got them, I'm not, I'm not sure they would have showed much because he wasn't actually in the hospital that long. And in the PSI, he said he hadn't, he hadn't achieved, he hadn't gotten mental health treatment in the past and he wasn't sure if it would help him. But I also don't want to get hung up on the records because I think they're only part of the point. I think, I think when you have this, this sort of unusual set of facts where the state is using his mental illness and repeatedly refer, referring to as not a normal thinking person, I think that should have raised some, some concerns, not just amongst defense counsel, but among the court and among, among the state that they should be asking for this because really it left him with, because, because he didn't raise this as an affirmative defense and the state is permitted to argue that he's mentally ill. The jury wasn't told how to consider any of this evidence. So they're not given an instruction like they would if he had raised an insanity defense or if he raised guilty, but mentally ill. So they're just left with this idea that maybe, maybe because he's mentally ill, he did commit aggravated arson. And that's, that's really not the way that our law is set up. We, when we raise mental health, it's generally considered a mitigating factor and not a factor to establish mens rea. It's interesting though, in this case, the, it was the defense account, the defense attorney in the context of, you know, the defendant's not speaking to me, I've got concerns that brought up the issue. The court, the state haven't questioned fitness and, and, you know, all parties in these actions are normally pretty quick to be looking for and aware of these fitness issues and to bring them forward. So I guess, I guess what I suggest to the court is that the defense counsel for themselves was satisfied that fitness was not an issue for some reason. Yeah. And I think they, I mean, I think they definitely deferred to defense counsel, but I think, you know, when the state was arguing in response to the defendant's motion and limine on that additional officer Cheney body footage, and he was expressing that this was not a normal thinking person. And he made the same arguments in the pretrial that he made, you know, to the jury after that footage got in. And I think at that point, somebody should have been saying, well, if mental health is going to be an issue to this extent, and we have no affirmative defense raised, somebody should be investigating what his underlying issues are. And I think at one point, the common at sentencing was, well, he appears calm now. Well, I mean, I don't think that's dispositive of anything. The fact that he's not having a breakdown in court doesn't change the fact that there was sort of a persistent thing. I mean, even eight hours later, and you know, I think there was some indication that that counsel believe there was a substance abuse issue here. I mean, she talked about it at at the sentencing hearing, because she had initially asked for a recommendation for substance abuse treatment. But then I go back to the record. No, I'm sure you're still talking about mental illness, drugs. What is the examination that you think should have been ordered here? And based on what evidence besides mental illness or acting strangely? Well, I, I, the the fitness statute allows any party to request an examination. And then that can assist the court in determining whether there's there's a bona fide doubt. But if the court believes there's a bona fide doubt, then she automatically orders the examination and holds the hearing. I my argument is that at a minimum, there should have been a request for an examination. Because yes, for fitness, right? And well, the statute, the statutes is set out kind of in two parts, right? You can anybody can ask for an examination to determine somebody's fitness to but then there's the other aspect of the statute that if based on everything you already know, you believe there might be a bona fide doubt, then the court goes ahead and appoints a mental health professional psychiatrist to go ahead and do the examination and then the hearing is held. So my understanding is it's that, you know, there's two ways to get to a fitness evaluation, either somebody, somebody orders the examination, and then they decide based on that whether, whether there's enough to have a fitness hearing, or there's just enough in the record to suggest he's unfit. At a minimum, at a minimum, that BCX should have been done. And that was because of a mental illness. Well, if I hear you saying, right, but if he's, I don't know if he's mentally ill, I, I'm loathe to have an attorney make that assessment without an actual examination. But the persistent the persistent delusions in this case, the fact that he's in his he's 50, there may be some underlying neurological issue there, the persistent belief that somebody's out to get him and he's going to be killed even after even if he was, you know, high on something, eight hours later, you'd think that that would have dissipated, but he's still having these beliefs. And the court was aware of it because she saw the footage at the at the hearing on the limb. They went into chambers and reviewed it. So I just think there's in this, this very unusual case, it's both it's both a fitness issue, and it's both an affirmative defense issue. But I don't think we can sit here and say without without the medical background, that this guy, you know, is fit, I just don't, I just don't see how you could have looked at everything that and not said, let's at least have an examination and rule it rule it in or rule it out. And so, you know, in this very unusual case, I would I would ask this court to remand this matter for a retrospective fitness hearing, or because it's been over a year vacate and remand for new trial. So moving on to the first argument, which had to do with the rebuttal footage. As I pointed out in the briefs, the originally barred footage from Officer Chaney's showing Pierce's reaction to what he perceived as a male officer pulling a gun on him. And his statements that people were out to get him should not have been admitted in rebuttal. First, the question posed by the prosecutor asking Pierce why he thought someone was trying to shoot him based on the squad car video was not relevant to whether he committed aggravated arson in the hotel room. It was beyond the scope of direct examination. The defense did not put Pierce's mental health in issue. So it was not relevant to an affirmative defense or other issue in his case. The statement the prosecutor referred to was made eight hours after the fire. So based on what was actually argued at trial, it wasn't relevant to state of mind when the fire occurred. Basically, the prosecutor knowing that he was barred from introducing most of Cheney's body camera footage, used a question about the squad car video to try to get that barred footage in under the theory that Pierce opened the door to the footage. The prosecutor should not be permitted to get otherwise inadmissible footage in through a back door. Second, the footage from Cheney's body camera was no less prejudicial during trial than it was at pretrial. The prosecutor used the footage to argue that Pierce was mentally ill based on its own interpretation of the footage. Yet there was no medical evidence in the record and the prosecutor's assertions were based on his speculation. The error in admitting the footage was compounded by its use by the state during the closing argument. The prosecutor played portions of the footage, then argued Pierce was not in a quote normal thinking state of mind. This created a risk that the jury convicted Pierce not because the state had actually established a mens rea for aggravated arson, but because he was mentally ill. And because Pierce's mental health was not put in issue as an affirmative defense, the jury was never instructed on how to consider evidence of Pierce's mental health in its deliberation. So for that reason, this court should vacate his conviction and remand for a new trial without the footage. And finally, with respect to the- Counsel, before you move on, can I ask a question? I mean, you're essentially arguing that that footage was irrelevant and prejudicial, is that right? Yes. What about the fact that once a defendant does testify, the search sort of explains the circumstances in his testimony, shouldn't the state be allowed to cross-examine or to rebut based upon the defendant's credibility challenging his version of events? Well, first of all, she should have objected to the question because that was based, that was clearly based on what he said eight hours later. So I think it was collateral to, you know, what was going on during the fire. But even assuming that that question was proper, the court should have just limited it to that, what that officer did, right? But we know from the record that a whole slew of Cheney's body camera footage came in because when the jury was deliberating, they asked for the portion where she Mirandized him. So you can see on the exhibit that there's a couple of different portions in there. And a lot of that footage came in that was originally deemed, you know, irrelevant and or highly prejudicial to him. And I think, you know, the fact that the state was playing that footage during closing argument, you know, beyond just to correct the his misperception of it, and then also arguing that he's, you know, paranoid, mentally ill and whatnot, just shows how prejudicial it is. So my long winded way of responding is even if you let in a portion of it, it should only be the portion with the officer touching his gun and not all of the rest of it. So moving on to the final argument, this had to do with the lack of a representative jury. The state conceded that Pierce made a prima facie showing of the two of the three factors, namely that African American men are a distinctive group, and that their underrepresentation in the veneering was not fair or reasonable in relation to the number of African American men in the hearing on the third factor, whether systematic exclusion occurred. The judges believe that the selection was random in a county where jury selection is the province of a jury commission and not a judge was an improper basis for denying the defense's motion. The judge cannot rule based on a personal belief. And there's at least some information indicating that the jury pool was not comprised of all of the required data. As noted, some data subsets may lack African entrance because, for example, African Americans may be less likely to obtain a driver's license. But given the difficulty in assessing the systematic exclusion issue, this claim should go back for an evidentiary hearing on that factor. So a set forth in the briefs appellant Pierce asked his courts to reverse his conviction and remand this matter for new trial or alternatively for a fitness hearing and a hearing on the jury representative jury issue. Okay, thank you for your argument. You will have rebuttal is Whitfield. You may proceed with your argument. Thank you. May it please the court. My name is Brittany Whitfield appearing on behalf of the appellee people of the state of Illinois. Your honors, there are four issues presented for this appeal. The first is whether the trial court erred in allowing the state to present as rebuttal evidence previously borrowed footage from an officer's body worn camera. The second is whether defendant was denied due process, his due process right to a fair trial due to mental health issues or alternatively, whether counsel was ineffective for failing to ask for behavioral clinical examination. The third is whether defendant received ineffective assistance of trial counsel. And the fourth is whether the trial courts are a man for a hearing on the defendant's motion that he was denied his constitutional rights to a jury of his peers. Taking the issue that defendant presented first, which was the issue concerning fitness. The state maintains that the defendant's fitness was in question by his own trial counsel, because he was not cooperating with his trial counsel. Absent other showings, there's no way to get from refusing to talk to counsel all the way to mentally unfit. There is a presumption in courts generally that defendants are presumed fit to stand trial absent more. We just can't go that far and say that defendant was mentally unfit. Further, the record show. Why not? What what what is absent? I mean, we know that he's been acting strangely. We know about certainly the circumstances, what he said regarding the arson. Um, why shouldn't the judge have taken it upon to go ahead and order a fitness hearing? Well, Your Honor, during the periods of the trial where the trial court was with defendant and independent presence, there was nothing that happened in the record that would spark the court to sui sponte order a fitness hearing. There were questions about whether the situation arose from substance abuse or whether there was something else with alcoholism going involved in this case. And the trial court didn't see anything during its own perception of defendant that raised to the level of ordering a fitness hearing. And neither did defense counsel when finally defense counsel was able to talk with defendant because defense counsel did attempt to order health records from the hospital and also talk to defendant concerning his mental health issues. But after a gap in that information in the record, defense counsel announced that she was ready to proceed to trial. And that was the extent that that mental health was considered by both defense counsel in the trial court. But defense counsel made it clear that she was only withholding moving forward respect to defendants mental health issues because she because she had yet to speak with defendant. But after she had conversed with him, she announced to the court that they were ready to proceed. So taking that from the record, it can be presumed that following the conversation with defendant, the issues regarding his mental health were no longer something that sparked even defense counsel to want to pursue that further. So without anything besides the incident itself, to establish mental health issues beyond that would just be a stretch. Moving on, defense counsel next went into the issue about the rebuttal video and whether or not the state defendant opened the door to the state's cross-examination using previously borrowed video footage. To be clear, the portion of the video that the state originally requested or originally questioned defendant about was the question that occurred eight hours later within the squad car video. And the record clearly shows that that portion of the video evidence was not excluded by emotion and lemony or any other means. Defendant's response, which was when asked about why he believed someone was going to shoot him, was that, well, the part of the video that you all didn't see was that an officer put a bullet in the chamber and pointed at me. So once defendant announced that there was a part of a video that was excluded to the jury, that opened the door for the video to come in, in its entirety. Because if the state were to constrict the video again to just the part, as counsel mentioned, where the officer touched his gun, that still would leave in the jury's mind the issue of whether there was more to the video that was further excluded and if those portions may have contained the situation that defendant had mentioned where an officer pulled out a gun on him. To expect for the state to limit the video evidence once a comment like that comes from the defendant would only do the same thing that excluding it entirely did in the first place, which was withhold a portion but also leave doubt within the mind of the jury as to whether or not that incident ever occurred. So the state was forced by defendant's comment to show the video in its entirety to disprove that that incident ever happened at any point between him being all the way to the police station and beyond. Unfortunately, that was a lot of video evidence and there were positions where the court did announce that although it did not say that the video was highly prejudicial, it did question the relevancy of it given that defendant's mental health was not at issue. But once defendant opened the door to that period of time where he was within the presence of officers that could have pulled out a gun and loaded a bullet into the chamber, the state had the right to disprove that argument in its entirety. Does the state need to disprove it in entirety or is it allowable for the state simply to use it in rebuttal to test the credibility of the defendant? The state should test the credibility of defendant when using the rebuttal evidence to come in. Okay. Moving forward to the third issue presented by defense counsel, which is whether or not defendant was denied his constitutional right to be tried by a jury of his peers. Although the state does concede that the first two factors of the Durham test, sorry, did I say no way to show that the underrepresentation of African American men in the veneer was a result of the systemic exclusion of African American men from the veneer. Defense counsel pointed to driver's license registrations as a way of showing that there was underrepresentation of African American men from the veneer because that's a way that the system pulls in potential jurors for jury trials. However, without more making the long stretch of saying that African Americans don't have driver licenses or enough registered driver's licenses to appear for veneer is a bit conclusive without much more to base that assumption on. And lastly, it's noted that defense counsel did not argue whether or not defendant received effective assistance of trial counsel, but the state maintains that defendant received effective assistance of trial counsel. Most importantly, the record supports the finding that defense counsel on various occasions followed up with defendant, pushed trial dates back in order to speak with defendant and communicated with defendant about the case at hand. In order to establish a claim of ineffective assistance of counsel, this court usually relies on people be strickling in the strickling test where the claims of prejudice or deficient performance have to be met, where the prongs of prejudice or deficient performance have to be met. And counsel did not advance any arguments about defendant's performance being deficient. But if the mental illness issue is taken as deficient performance, counsel still fails to show how or argue how defendant was prejudiced by the defense counsel's trial strategy. Without more defendant fails to raise a claim of ineffective assistance of trial counsel. If there are no questions, the state concludes that for the forgiven going reasons that this court that we request that this court find in favor of the appellee and affirm the rulings of the trial court. Thank you. Okay, I see no questions. Thank you. Is there any rebuttal? Yes, Your Honor. I just want to go a little bit out of order and just touch up again on the state's arguments with respect to the rebuttal video. The statement that he made in the squad car, which prompted the question, why did you believe people were shooting at you? Just had no relevance to what happened in the hotel room. None. I mean, it was a statement made eight hours later. So the fact that we're arguing about, you know, whether the officer chambered around really has no bearing on what the defendant's state of mind was at the time the fire started. It wasn't introduced, you know, his his mental health issues weren't introduced as an affirmative defense by the defendant. So the question itself leading to all this debate about the footage became a sideshow. I mean, it became then the question the jury is considering, well, you know, how how mentally ill is he? And how does this bear on the fire? It just shouldn't have come in to begin with. And the fact that that there was so much discussion on it, and it prompted the state to make this argument to the jury, that the client was not normal thinking, at the time he set the fire when the statement was made eight hours after that, just goes to show how prejudicial it was. And as far as the IEC claims, the jury wasn't told, you know, what to do with this evidence. And because defense counsel didn't adequately investigate this, this mental health issue, or really have any response to what the state was clearly prepared to do, we know they were prepared to do that from the hearing on the motion in limine. Then when the question was asked, and the response was given, then they just, you know, ran with that and then made the case about whether this guy committed arson, because he had some sort of mental health breakdown. And so I think, you know, for all the reasons that I talked about in the opening argument in my briefs, this evidence just shouldn't have come in, it was just collateral, and not not relevant. And again, even if you're even if you want to put in the portion about the holster, we're still talking about something that didn't have anything to do with the fire. Um, and then going back to the issue of fitness, you know, I think the whether or not he was cooperative or not, sort of overstates the record a little bit, I don't, you know, the fact that he's he's talking to her doesn't mean that he's assisting in his own defense, or doesn't mean that he's, you know, that these issues aren't overcome by whatever else is going on with him. And then I just think at a minimum, they should have done the examination. And I don't think we can just, you know, everybody in this case wanted to defer to defense counsel. But again, I'd point out the trial court saw some of this footage before the trial started. And then the state made this argument both in its rebuttal and during closing arguments. And then at sentencing, this was the main argument in aggravation. And, you know, so you'd think that if there was a substance abuse issue here that was driving this behavior, there would have been a drug possession charge, or some evidence of intoxication, and the state would have been arguing, he's a drug addict that sets hotel rooms on fire. And that just didn't occur. The main argument was mentally ill, and defense counsel was left with no way to respond to that. Beyond that, everybody had an obligation to make sure he was fit. It wasn't just defense counsel, it was the trial court, and it was the prosecutor as well. And they should have had the evaluation. And finally, on the last issue, you know, this is a the establishing systematic exclusion is just very difficult. It's a constitutional right to have a representative jury. But the way this is set up, it's very hard to establish. My argument with respect to the data, I think, was that Illinois law requires you to include a number of subsets, including unemployment records. And so if some of that is missing, it's just unclear whether or not the jury can really be representative, knowing what we know about participants in these different types of sets. So if unemployment, people collecting unemployment insurance was excluded, that runs the risk that there was a lack of a representative veneering. So that was mainly the point, it wasn't just the driver's license issue, but that's one component of it. So for all these reasons, I would ask the court to grant the relief I've previously requested. Okay, thank you, Miss Kinstren. Also, thank you, Miss Whitfield. The case is now submitted and the court will stand in recess until further call.